IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-mj-144 |
| RUSSELL RICHARDSON VANE, IV,<br>    a/k/a "Duke Russ Hampel,"<br>    a/k/a "Duke," | |
| Defendant. | |

## <u>UNITED STATES' MEMORANDUM ON DETENTION</u>

The United States of America, by and through the undersigned counsel, respectfully requests that the Court order the detention of the defendant, Russell Richardson Vane, IV ("Vane" or "defendant"), because there is no condition or combination of conditions that will reasonably ensure either the defendant's appearance or the safety of the community if he is released. The charge with which the defendant stands accused, attempted production of a biological weapon, specifically, ricin, in violation of 18 U.S.C. § 175(a), carries a presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(C) (establishing statutory presumption in favor of defendant's detention, both due to risk of defendant's non-appearance and danger to community posed by defendant's release). This offense is extraordinarily serious and the facts and circumstances of this case are unusually aggravated. The complaint charges the defendant with an attempt to produce ricin, but as evidence of the preliminary results from the FBI laboratory analysis that the United States expects to present at the detention hearing will show, he was successful in that attempt. Accordingly, as explained

1

further below, the defendant poses both a tremendous risk to public safety and a serious risk of flight.

## BACKGROUND

The defendant is a 42-year-old resident of Vienna, Virginia.  He lives with his wife and three young children.  Prior to his arrest, he was an employee of a United States government agency.  He was placed on administrative leave from his employment in the first week of April 2024, after local and national press reporting described his alarming interactions with an Eastern Virginia militia group, the Virginia Kekoas militia ("Kekoas").  As is explained briefly in the affidavit in support of the criminal complaint, the defendant was ousted from the Kekoas in March 2023 after making repeated comments to group members about constructing homemade explosives, among other disturbing statements, and providing the group members with copies of U.S. Government documents containing instructions on how to construct homemade explosives. The United States expects to proffer at the detention hearing that those documents were searched for, accessed, and printed from the defendant's work computer, and had no legitimate relation to his work duties.

In February 2024, the defendant exchanged encrypted chats with a Kekoas member in which the defendant asked, "Would you be interested in learning some things about HME or is that too spicy for this stage of the game[.]" The Kekoas member responded, "HME?"  The defendant replied, "Homemade [explosion emoji]."  In another chat, the defendant wrote to a Kekoas member, "A whole lot of houses burning and going kaboom.[1] I wonder if some subversive

---

[1] This comment appears to reference at least three residential explosions in northern Virginia in the months preceding the comment, including the destruction of the home of James Yoo in Arlington County in December 2023, where an explosion reduced the house to rubble after Yoo

force has released some literature and is encouraging these explosions? [Thinking face emoji]." In yet another chat, he wrote to a Kekoas member, "I passed [a Kekoas member] the DIA unclassified homemade explosives answer to Cellulose and Black powder and a map."  In another chat, he wrote, "The least you could have done is let the squad collect some low concentration H2O2 for me.  The other parts I can source without trouble.  When the tanks come we are going to have to run but at least we could set traps better than earthworks."  In common usage, H2O2 is known as hydrogen peroxide, and, as the affidavit in support of the criminal complaint explains, is a common precursor chemical in homemade explosives.

On April 10, 2024, Special Agents from the Federal Bureau of Investigation ("FBI") were in the process of executing a search warrant on the defendant's residence when they discovered what appeared to be a makeshift ricin lab on a shelf in the defendant's laundry room.  Specifically, on that shelf, agents discovered a gallon-sized Ziploc bag of castor beans; a set of used laboratory equipment, including beakers, funnels, flasks, crucibles, a graduated cylinder, and several test tubes, including one test tube with a tan powdery substance inside; a set of fine mesh strainers, pH test strips, a laboratory-style hotplate/stirrer device; and handwritten notes that included a step-by-step recipe for isolating ricin toxin from castor beans, and a shopping list that includes "Ricin Test Strips."  Elsewhere in the laundry room and in other places in the house, agents seized a number of chemicals used in the production of ricin from castor beans.

---

barricaded himself inside the home when Arlington Police Department attempted to execute a search warrant; a residence in Loudoun County in February 2024 where a leaking propane tank triggered a massive explosion, reducing the house to rubble and killing one fire fighter; and a house fire in Fairfax County in March 2024 that neighbors reported was preceded by the sound of an explosion.

That evening, after obtaining a search warrant authorizing the seizure of the unexpected ricin materials and equipment, the FBI executed a probable cause arrest for the defendant.

In the intervening days since the complaint was sworn out, the laboratory has been able to conduct preliminary testing on the items seized from the residence. The test tube with the tan powdery substance inside, along with three of the seized funnels, a 500 mL Erlenmeyer flask, a crucible, and a 250mL flask all tested positive for ricin toxin.

On April 10, 2024, the Honorable Lindsey R. Vaala, United States Magistrate Judge for the Eastern District of Virginia, authorized a criminal complaint against the defendant, charging him with one count of attempting to produce a biological agent or toxin, in violation of 18 U.S.C. § 175(a).  ECF No. 1.  The charge is punishable by life imprisonment.  The defendant had his preliminary hearing on April 11, 2024.

## APPLICABLE LAW

Upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court must order a defendant's pretrial detention.  18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f); *see United States v. Salerno*, 481 U.S. 739, 750 (1987).  A finding of risk of flight must be supported by a preponderance of the evidence.  *See United States v. Stewart*, 2001 WL 1020779, at *2 (4th Cir. 2001).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  18 U.S.C. §§ 3142(e)(1), (f)(2).

The Court must consider the following factors to determine whether detention is appropriate: (1) the nature and circumstances of the offenses charged; (2) the weight of the

4

evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Pursuant to the Bail Reform Act, the Government may proceed by factual proffer in lieu of presenting live witnesses at a detention hearing. *See United States v. Williams*, 753 F.2d 329, 331 n.7 (4th Cir. 1985) ("Evidentiary proffers are approved by 18 U.S.C. § 3142(f)."); *United States v. Chappelle*, 51 F. Supp. 2d 703, 706 (E.D. Va. 1999); *see also Gerstein v. Pugh*, 420 U.S. 103, 120 (1975) (approving of a judge issuing a detention order based on "informal modes of proof" such as hearsay and written testimony).

Under 18 U.S.C. § 3142(e)(3)(C), there is a rebuttable presumption that no conditions will assure a defendant's presence as to both flight risk and danger if, as in this case, the defendant is charged with an offense listed in 18 U.S.C. § 2332b(g)(50)(B)[2], for which a maximum term of imprisonment of 10 years or more is prescribed. Section 175 of Title 18, United States Code, is included in this list of offenses.

When the presumption applies, it operates "at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). However, the presumption is not "a bursting bubble" that disappears when any evidence is presented by the defense; rather, to rebut the presumption, "the defendant must produce some evidence while the judge remembers the fact that Congress found certain offenders to pose special risks of flight." *United States v. Sheikh*, 994

---

[2] This is the list of offenses defined as "Federal crimes of terrorism" when they are committed with a terrorist intent. *See* 18 U.S.C. § 2332b(g)(50)(A). However, it is not necessary to show that the offense was committed with a terrorist intent for it to a be a presumption offense under 18 U.S.C. § 3142(e)(3)(C), only that it carry a maximum term of imprisonment of 10 years or more.

F. Supp. 2d 736, 739 (E.D.N.C. 2014).   In other words, the presumption remains an evidentiary finding militating against release and to be weighed along with all of the evidence relating to the factors listed in 18 U.S.C. § 3142(g).   *See United States v. Cherry*, 221 F. Supp. 2d 26, 32 (D.D.C. 2016) (citing *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), and *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)).

## ARGUMENT

The defendant poses an enormous danger to the community and a significant risk of flight due to his production of ricin, knowledge of chemistry and "prepper" skills, and enthusiasm for homemade explosives and firearms.

### I.   The Nature and Circumstances of the Offense are Exceptionally Serious

The defendant is charged with attempting to produce a biological agent or toxin, specifically, ricin.   Ricin is made from the beans of the castor plant, and can be made in powder, liquid, or crystal form.   *See Facts About Ricin*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/ricin/facts.asp.   Methods of exposure to ricin poisoning include inhalation, ingestion, and skin and eye exposure.   *Id*.   Even a miniscule dose of ricin can be lethal. As little as one milligram of ricin, when ingested, can be enough to kill an adult.   *Ricin Fact Sheet*, MINN. DEPT. OF HEALTH, https://www.health.state.mn.us/diseases/ricin/ricin.html.   There is no antidote for ricin poisoning; the only treatment is management of symptoms.   *Id*.   Indeed, ricin is so toxic that the United States considered weaponizing it for biological warfare as early as World War I.   Susan Borowski, *From beans to weapon: The discovery of ricin*, AM. ASS'N. FOR THE ADVANCEMENT OF SCI. (July 11, 2012), https://www.aaas.org/beans-weapon-discovery-ricin.

6

While the defendant was charged with attempting to make ricin, as the United States intends to show at his detention hearing, the preliminary lab results show that he actually succeeded in doing so.   His success following the handwritten ricin recipe found with the laboratory equipment in his residence is exceedingly alarming.   After all, not only was he *trying* to manufacture a lethal toxin, but he also carelessly exposed his household to the final product—again, a toxin that can be inhaled, ingested, or cause poisoning by topical exposure.

Here, the defendant was making ricin in his home, where he lives with his wife and three young children.   He stored it as haphazardly as one might an extra box of lightbulbs: on an ordinary high shelf in the laundry room, in a plain cardboard box, without even sealing it up.   The defendant's notes, found with his makeshift home laboratory, further demonstrate his casual disregard for the extraordinary danger he created for himself, his family, and his neighborhood: he included "Ricin Test Strips" near the end of a handwritten "to-do" list, after mundane home repair tasks and chores, like taking the trash out.

The nature of the offense with which the defendant has been charged is serious on its own; the circumstances under which he committed this offense are exponentially worse.   Thus, this factor militates in favor of his detention.

## II.   Based on the Defendant's History and Characteristics, He is a Flight Risk

The defendant is an experienced "prepper," or expert in emergency preparedness.   While that may be an admirable trait in many circumstances, here it renders the defendant an unacceptable risk of flight.   Even were the Court to seize his travel documents such that he could not flee the country, the defendant has thoroughly researched how to "go off the grid," and has an established plan to do so.   Facing a potential life sentence and overwhelming evidence, and armed with his

detailed contingency plans, he could readily flee the area, go into hiding, or otherwise simply fail to appear at trial. *See United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (holding that the gravity of the offenses and the potential prison term create a considerable incentive for the defendant to avoid prosecution and the likelihood of imprisonment in the event of a conviction).

The United States will proffer or introduce testimony at the detention hearing regarding additional items seized from the defendant's house that demonstrate his worst-case-scenario planning and emergency preparedness, including an abundance of cash and precious metals. The defendant will likely argue that this plan was intended to be used only in the event of catastrophe or societal collapse. But even if that were true, it nevertheless leaves him unusually well-equipped to flee the consequences of his actions. After all, the circumstances in which the defendant finds himself today are certainly among the "worst case" that he might reasonably face in his lifetime.

The defendant also recently made plans to change his name and—apparently—to fake his own death. As explained in the affidavit in support of the criminal complaint, on April 3, two days after the first press article about his communications with the Kekoas about constructing homemade explosives, the defendant filed a petition in the Fairfax County Circuit Court to change his name from Russell Richardson Vane, IV, to "Duke Russ Hampel." That same day, the defendant posted a fake obituary to the website Legacy.com, which advertises itself as "the world's largest obituary database," *see* Legacy, https://www.legacy.com, claiming that he had died on March 11, 2024, the day he was dismissed from the Kekoas. The United States anticipates presenting additional evidence on this subject at the detention hearing, but may request that it be done at sidebar or under seal to protect the defendant's privacy.

Based on the history and characteristics of the defendant, he presents a substantial risk of flight that cannot be lessened by simply seizing his travel documents or restricting him to his home.

### III.      The Defendant Poses a Grave Threat to the Safety of the Community

The defendant poses an unacceptable threat to the public.  His nonchalant ricin production and storage, discussed above, clearly demonstrates the frightening danger he is to himself, his family, and his community.  But the defendant's knowledge of and interest in advanced chemistry is not just limited to manufacturing toxins associated with biological warfare.  In his communications with the Kekoas, the defendant expresses an enduring and almost fanatical interest in homemade explosives.  Not only did he aggressively pressure the Kekoas to produce homemade explosives and obtain precursor chemicals such as hydrogen peroxide for him, but he provided them with U.S. Government documents concerning explosives-making in an effort to encourage the militia to adopt his ideas.  Indeed, the Kekoas themselves were apparently so unnerved by the defendant's behavior, including an incident wherein they alleged he pointed a rifle towards a parking lot full of motor vehicles and road that was actively being used by civilians, in potential contravention of Virginia law,[3] that they removed him from the militia.

It is apparent that the defendant has a troubling history of firearms safety—or the lack thereof—and use.  When searching the defendant's residence, law enforcement found 23 firearms scattered throughout the house, including multiple unsecured guns in a filing cabinet drawer and closets, and one loaded shotgun leaning against the wall in the master bedroom, easily accessible by the children in the house.  *See* Va. Code § 18.2-56.2(A) (making it a Class 1 misdemeanor "for

---

[3] *See* Va. Code § 18.2-282 (making it a Class 6 felony to "hold a firearm . . . in a public place in such a manner as to reasonably induce fear in the mind of another of being shot or injured").

any person to recklessly leave a loaded, unsecured firearm in such a manner as to endanger the life or limb of any child under the age of fourteen"). Firearms ownership is, of course, a Second Amendment right, but the defendant was also convicted in 2011 of possessing a firearm on federal property, a misdemeanor in violation of 18 U.S.C. § 930. *See United States v. Vane*, Case No. 8:11-cr-191, ECF No. 26 (D. Md. June 7, 2011). According to the criminal complaint filed in this matter, the defendant attempted to enter a federal facility with three firearms in his car, including "two ... just lying on the floor." *Id*. at ECF No. 2 (D. Md. Feb. 9, 2011).

Together, the facts paint a grave picture of the threat the defendant poses to public safety. He is a manufacturer of biotoxins, which he stores recklessly in his ordinary neighborhood home that he shares with his young family; is fixated on homemade explosives; and displays a callous disregard for firearms safety that is exacerbated by his other risky—and indeed, outright dangerous—behavior. It is clear that there is no combination of conditions that can sufficiently mitigate the risk that the defendant poses to the community.

## IV.    The Weight of the Evidence is Against the Defendant

Where the evidence of guilt is strong, it provides a considerable additional incentive to flee. *See Sheikh*, 994 F. Supp. 2d at 742 (finding that the defendant had a strong incentive to not appear in part because the evidence was strong). In this case, law enforcement recovered ricin, laboratory equipment, a recipe for ricin, and other notes referencing ricin-associated materials from the defendant's own home. Preliminary laboratory results have confirmed that the defendant indeed synthesized ricin. Further, law enforcement has a wealth of evidence, including the defendant's own statements in texts and similar messages, of his avid interest in weapons that are capable of causing mass casualties—that is, homemade explosives—that demonstrates his purpose

for manufacturing ricin in his home.  Given the strength of the evidence against him, there is no condition or combination of conditions that would ensure the defendant's appearance in court or the safety of the community.

## CONCLUSION

For the foregoing reasons, there is no "condition or combination of conditions [that] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(e)(1).  In light of the above, the defendant cannot rebut the presumption of detention in this case.  *See id*. at § 3142(e)(3)(C).  Accordingly, the United States respectfully requests that he be detained pending trial.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
       Danya E. Atiyeh
       Amanda St. Cyr
       Assistant United States Attorneys
       United States Attorney's Office
       2100 Jamieson Avenue
       Alexandria, Virginia 22314
       Phone: (703) 299-3700
       Email: danya.atiyeh@usdoj.gov
           amanda.st.cyr@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

/s/
Amanda St. Cyr
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Email: amanda.st.cyr@usdoj.gov